UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD A. MATHIOUS, JR.,

        Plaintiff,               Case No. 05-74714

vs.                            DISTRICT JUDGE DAVID M. LAWSON
                             MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Richard Mathious brought this action under 42 U.S.C.§405(g) and §1383(c)(3)to challenge a final decision of the Commissioner denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED IN PART** and the Commissioner's motion for summary judgement **DENIED** and this case **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.

### A.    <u>Procedural History</u>

Plaintiff protectively applied for SSI on November 21, 2001 (R. 62-68), alleging that he had been disabled since that date due to problems with his lower back, Hepatitus C, and

depression (R. 76).[1]  After Plaintiff's claim was initially denied (R. 42-45), a hearing was held

on August 10, 2004, before Administrative Law Judge John Christensen (ALJ) (R. 255-284).

Plaintiff was represented by his current attorney, Lewis M. Seward.  Plaintiff's wife, Beverly

Jean Mathious (R. 271-276), and Vocational Expert Timothy Shaner (VE) also testified (R. 276-

283).

       In a December 22, 2004, decision ALJ Christensen concluded that Plaintiff was not under

a disability as defined by the Act because excluding drug and alcohol abuse Plaintiff had the

residual functional capacity to perform a restricted range of light work (R. 22-35).  On October

14, 2005, the Appeals Council denied Plaintiff's request for review (R. 4-6).

### B.    Background Facts

#### 1.    *Plaintiff's Hearing Testimony*

       Plaintiff was 45 years old, 5'8" tall and weighed 160 pounds at the time of the hearing (R.

64, 82, 261-263).  Plaintiff was married and had a 17 year old stepdaughter.  He did not have a

driver's licence.  He finished the eighth grade in special education classes and had no other

vocationally relevant past work experience (R 263).[2]  Plaintiff could "read what [he could]

understand" and write "somewhat" (R. 263).  Yet, he was unable to write either a letter or a

"simple note" (R. 264).

---

[1] In a handwritten application, Plaintiff alleged that he became disabled in "1981 or
1982" (R. 64).  For SSI purposes, Plaintiff's onset date would be the protective filing date of his
application, November 21, 2001.  Although Plaintiff argues (Pl.'s Br. at 7) that the ALJ
misstated the onset date, the ALJ was actually correct in stating that Plaintiff *alleged* he became
disabled in 1981.  On remand, the ALJ is directed to analyze this case from the proper onset
date.

[2] Plaintiff's counsel indicated that Plaintiff's special education records had been
destroyed (R. 266).

Plaintiff testified that in the last 15 years he had never worked on a regular, full-time basis for wages for three months or more continuously at the same job.  He was in the Army National Guard for a few weeks, but they "put [him] out."

He indicated that he had been attending Alcoholic's Anonymous meetings since February 2004 (R. 265).[3]  Plaintiff last drank alcohol during the weekend before the hearing.  He last used drugs four years prior to the hearing (R. 266-267).

Plaintiff reported that he had his left heart valve replaced, but the right valve was still leaking (R. 267).  The condition caused him to feel exhausted, dizzy and occasionally pass out (R. 267-269).  He tried getting a  good night's rest, but that failed to remedy his symptoms (R. 268).  As a result of his exhaustion, Plaintiff indicated the need to lay down a few hours a day. Plaintiff was also diagnosed with both Hepatitis B and C, but was not aware of any symptoms associated with his illness (R. 269).

Plaintiff testified that he was suffering from depression since the death of his first wife in April 2000.  He gets daily "flashbacks" in which he sees his wife "laying in blood laying there, an [him] washing, washing it off and trying to get her clothes on and not – but not knowing that she was dead" (R. 270).  At the time of the hearing, he was not receiving counseling and was unsure of the medication he was taking besides aspirin.

Plaintiff cooked "a little bit," but was unable to follow a recipe (R. 271).  He was able to look up a phone number, but only if he had the number spelled out for him.

---

[3] Plaintiff also supplied the record with a list of the dates and times of attendance at AA meetings (R. 114).

3

2.      ***Plaintiff's Wife's Hearing Testimony***

Mrs. Mathious testified that Plaintiff was able to bathe himself and tend to his hygiene, but that she primarily cooked, cleaned and did the laundry (R. 273).  Plaintiff provided additional help when Mrs. Mathious was ill or recovering from surgery.  Mrs. Mathious said that Plaintiff was able to follow directions, but she had to "explain it to him like in a sense like a – sometimes like you explain to a child."  She also read Plaintiff his mail and filled out his paperwork and forms (R. 274).

Mrs. Mathious felt Plaintiff had a "little improvement" since his heart surgery.  Yet, she indicated that Plaintiff did not walk as much as prior to his surgery and remained tired (R. 275).

Plaintiff visited with family and occasionally attended church.  He also attended AA meetings and went to appointments with his probation officer.

3.      ***Medical Evidence***

On July 31, 2002, Plaintiff underwent a physical examination performed by Silva Sankaran, M.D., at the state agency's request (R. 119-26).  Dr. Sankaran noted that Plaintiff had had complaints of lower back pain since 1980, in an accident when he was being transported to jail (R. 119).  He reported that Plaintiff had Hepatitis C and depression.  Plaintiff was being treated for depression with Paxil 20 mg daily, which was not helping (R. 120).  He had suicidal thoughts and wanted counseling, but did not have the insurance to pay for it.  Dr. Sankaran reported that Plaintiff drank two 40-ounce bottles of beer daily.  Plaintiff's physical examination was normal (R. 120-24).  X-rays of his lumbar spine showed degenerative arthritis with a narrowing of the joint space at L5-S1 and spondylitic changes (R. 121).

On September 29, 2002, Plaintiff was psychologically evaluated by Thomas J. Olson,

4

Psy.D., and Ann L. Date, Psy.D., at the state agency's request (R. 127-34).  Plaintiff reported

that he was previously on disability, but it was cancelled because "that woman said I was under

the influence of alcohol and drugs" (R. 127).  He also reported suicidal tendencies and

depression. Plaintiff stated that he had never worked, but admitted to a long criminal history (R.

127-28).   Plaintiff also stated that he enjoyed "hanging out with other people" if "they ha[d]

something to drink" (R. 129).  Dr. Olson and Date indicated that Plaintiff appeared to have

struggled with a "Learning Disability and probable Borderline Intellectual Functioning since

early childhood."

On examination, Plaintiff's thought process was mildly disorganized, and he had an

inability to recognize the effects of alcohol on his life as well has an inability to learn from

mistakes or understand basic cause and effect relationships (R. 130).  In addition to alcohol

dependence, Plaintiff was diagnosed with cocaine and heroin dependence, both "in full remission

per claimant report" (R. 133).  Drs. Olson and Date also opined that Plaintiff had a global

assessment of functioning (GAF) of 45 (R. 133-34).[4]  Plaintiff's prognosis for improved

psychosocial functioning was contingent upon whether or not he entered into appropriate

---

[4]   The GAF score is a subjective determination that represents "the clinician's judgment
of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC.,
DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at
30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or
others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with
clear expectation of death).  *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in
reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or
major impairment in several areas such as work or school, family relations, judgment, thinking
or mood." *Id.*  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any
serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep
a job)."  *Id.*   A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or
occupational functioning. *Id.*

5

substance abuse treatment and case management (R. 134).  Plaintiff did not appear to be capable of managing his own benefit funds due to active alcohol dependence.

Ronald C. Marshall, Ph.D., completed a psychiatric review technique form (PRTF) in October 2002, in which he opined that Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and had had no episodes of deterioration or decompensation (R. 145).  Dr. Marshall also completed a mental residual functional capacity (RFC) assessment, in which he opined that Plaintiff was not significantly to moderately limited in all areas of work-related functioning (R. 149-50).

A physical RFC assessment in October 2002 indicated Plaintiff was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently; standing/walking for six hours, and sitting for six hours, in an eight hour day; and pushing and pulling an unlimited amount of time (R. 155-62).

On June 25, 2003, Plaintiff was admitted to St. Mary's Medical Center after complaining about shortness of breath (R. 165-82).  A trasnesophageal echocardiogram confirmed evidence of aortic regurgitation (R. 174).  The social history of Plaintiff's medical records states: "the patient is a smoker of one pack per day.  Also, drinks a 6-pack of beer" (R. 167).

On August 7,  2003, Shiraz Shariff, M.D., performed a coronary examination and diagnosed Plaintiff with valvular heart disease, severe aortic insufficiency, severe pulmonary hypertension, with mild mitral and pulmonary insufficiency (R. 183-84).  Two consultants that examined Plaintiff during this time period at the request of Dr. Shariff reported that Plaintiff used alcohol only "occasionally" (R.197, 200).  Thereafter, Plaintiff underwent a aortic valve

6

replacement (R. 212-28).  In November 2003, Plaintiff's valve was performing well, and

Plaintiff felt "fine" (R. 234).

On August 18, 2003, Plaintiff underwent a esophagogastroduodenoscopy, which

confirmed Plaintiff had multiple superficial ulcers in the antrum of the stomach without bleeding

(R. 190).

On March 9, 2004, Plaintiff underwent a mental status examination by Gerald Williams,

Ph.D. (R. 236-42).  Plaintiff reported an extensive history of drug and alcohol abuse and criminal

activity including spending three months in jail for sexual assault (R. 236, 238).  Yet, Dr.

Williams indicated Plaintiff put forth a "maximum effort" (R. 239).  On intelligence testing,

Plaintiff obtained a verbal IQ of 61, a performance IQ of 60, and a full scale IQ of 57.  Plaintiff's

vocabulary which is the ability to conceptualize and define words was given a scale score of two

and a percentile rank of .4%.  Dr. Williams diagnosed schizoaffective disorder (R. 241).  He

rated Plaintiff with a GAF of 60.  Dr. Williams recommended a psychiatric consultation, group,

and individual counseling.

Dr. William's also found that Plaintiff was "markedly" limited in the following areas:

1. the ability to understand remember detailed instructions,

2. the ability to carry out detailed instructions;

3. the ability to maintain attention and concentration for extended periods;

4. the ability to perform activities within a scheduled, maintain regular attendance
and be punctual within customary tolerances;

5. the ability to sustain an ordinary routine without supervision;

6. the ability to work in coordination with a proximity to others without being
distracted by them;

7. the ability to complete a normal workday and work week without interruptions from psychologically based symptoms;

8. to perform at a consistent pace without an unreasonable number and length of rest periods;

9. the ability to accept instructions and respond appropriately to criticism from supervisors; and

10. the ability to set realistic goals and make plans independently of others.

(R. 245-246).

**4.**    ***Vocational Evidence***

ALJ Christensen asked VE Shaner to consider an individual the same age, education and work experience of Plaintiff who can meet the demands of light work, simple, routine tasks only in a low-stress environment, never climb ladders, rope, scaffolds, have no exposure to unprotected heights or unguarded hazardous machinery, only occasionally climb ramps or stairs, and engage in only occasional non-repetitive use of the left upper extremity for reaching, handling, grasping or fingering (R. 278). VE Shaner testified that this hypothetical person could perform both light and sedentary work, including 8,000 cleaner jobs, 1,800 inspections jobs, and 500 surveillance system monitor jobs (R. 279). ALJ Christensen then asked the VE to assume he also found that as a result of fatigue and depression this hypothetical person could not sustain sufficient concentration, persistence and pace to do even simple, routine tasks on a regular continuous basis, meaning 8 hours a day, 5 days a week (R. 280). VE Shaner stated that assuming such limitations would preclude all competitive employment.

Plaintiff's counsel asked the VE to assume a person consistent with the ALJ's first hypothetical who is functionally illiterate (R. 281). VE Shaner testified that such an assumption would not alter his previous answer. Plaintiff's counsel then asked the VE to to assume a person

8

consistent with the ALJ's first hypothetical who could have no contact with the general public (R. 282).  VE Shaner testified that again such an assumption would not alter his previous answer.

### 5.  *The ALJ's Decision*

ALJ Christensen found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability and had no past relevant work experience (R. 34).  Plaintiff's drug and alcohol abuse, Hepatitis B & C, hypertension, lower back pain, pulmonary hypertension, and status post valve replacement qualified as severe impairments.  Yet, the severity of Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").  ALJ Christensen concluded that excluding drug and alcohol abuse Plaintiff was not "disabled" within the meaning of the Act.

ALJ Christensen found that drug and alcohol abuse was material to a finding of disability (R. 31).  He noted that in a prior February 24, 2000, decision, ALJ John A. Ransom found that drug and alcohol abuse were material to a finding of disability.[5]  Plaintiff had not "held down" a job for any significant period of time and had a long criminal history.  The June 25, 2003, records from St. Mary's Hospital indicate Plaintiff admitted to drinking a 6-pack of beer a day and of past drug use including cocaine and heroine.[6]  ALJ Christensen noted that Dr. Olson's September 29, 2002, records state that Plaintiff admitted he liked hanging around people if they "got something to drink."  ALJ Christensen opined that "the 'marked limitations' found by Dr.

---

[5] ALJ Ransom's decision is not included in the record before the Court.

[6] As discussed *supra*, Plaintiff challenges the ALJ's interpretation of the St. Mary's records.

9

Williams and low IQ scores he noted are more consistent with alcohol and drug abuse, not with severe intellectual functioning.  Dr. Williams did not diagnose any intelligence related impairments"[7]  Finally, ALJ Christen remarked that Plaintiff's presentation at the time of hearing was not consistent with a person with severe mental retardation.

In light of his determination that drug and alcohol abuse was material to a finding of disability, ALJ Christensen evaluated whether Plaintiff could perform work excluding drug and alcohol abuse (R. 31-32).  He noted that Plaintiff had recently undergone surgery for a leaking heart valve, but Dr. Shariff's November 18, 2003, treatment notes indicated Plaintiff's valve was performing well and Plaintiff admitted to "feeling fine."  Plaintiff had not received any treatment for his alleged back pain or hepatitis.  In addition, ALJ Christensen stated that ALJ Ransom previously found Plaintiff could perform heavy work.

The ALJ concluded Plaintiff retained the residual functional capacity of light work, performing simple, routine tasks in a low-stress environment, with no climbing of ladders, rope, and scaffolds, with no exposure to unprotected heights or unguarded hazardous machinery, with only occasional climbing of ramps or stairs, and engaging in only occasional non-repetitive use of the left upper extremity for reaching, handling, grasping or fingering.  He found that based on the VE's testimony Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy (R. 33).  Therefore, ALJ Christensen determined that Plaintiff was not disabled.

_____

[7] Dr. Williams does not state that his findings are more consistent with alcohol and drug abuse.

**II.**   **ANALYSIS**

**A.**   **Standard Of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[8]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the

_____

[8] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

11

Plaintiff can perform.

**B.    Factual Analysis**

In his motion for summary judgment Plaintiff argues that this case should be remanded for a computation of benefits because Plaintiff meets or equals the impairment listing 12.05(B). As an alternative to a listing-level impairment, Plaintiff argues (1.) the evidence in the record demonstrates he lacks the mental residual functional capacity to work any job on a regular and continuous basis and (2.) Plaintiff cannot perform the jobs listed by the VE since he cannot meet the reading requirements as specified under the Dictionary of Occupational Titles ("DOT").

*1.    Listing 12.05*

The introduction to the mental impairment listings, including Listing 12.05, explains,

The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). *If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria*, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) (emphasis supplied).

The relevant portions of Listing 12.05 follow:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

12

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
****
B. A valid verbal, performance, or full scale IQ of 59 or less;
Or
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
Or
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A) MENTAL DISORDERS notes:

We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) if the listed impairment are satisfied.

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) cites this provision in noting that a "claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder." Here that requires finding:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Listing 12.05.

*Foster* found insufficient proof of mental retardation prior to age 22, and therefore held that plaintiff did not meet or equal the listing.

In this case, the evidence does not demonstrate or support onset of "significantly subaverage general intellectual functioning with deficits in adaptive functioning" before age 22. Plaintiff has failed to show that his general intellectual functioning was "significantly

13

subaverage" prior to that age.  As in the *Foster* case where her first test was at age 42, none of Plaintiff's testing or evaluation was contemporaneous with his developmental period.  Plaintiff was already 44 years of age when the IQ test at issue was performed on March 9, 2004.  The only evidence on the record that Plaintiff may have suffered "significantly subaverage general intellectual functioning" prior to age 22 is a statement by Plaintiff that he attended Special Education classes (R. 266).[9]  Plaintiff's counsel, however, states that those records have been destroyed, thereby providing no evidence in the record.  Yet in *Foster*, the Sixth Circuit found that Plaintiff did not meet or equal the listing even though Plaintiff stated she had completed the ninth grade in Special Education classes and that she had tried four times without success to earn her GED.  *Foster*, 279 F.3d at 354.  Here Plaintiff in his February 13, 2002, Disability Report, claims disability only due to "back-pain, hepatis C, depression" and does not mention any intelligence limitations, as one might expect if earlier test results or childhood records indicated such a problem – even if those records were not preserved (R. 76).  Because Plaintiff has failed to demonstrate that his intelligence impairment satisfies the diagnostic description for the listed impairment prior to age 22, the ALJ did not err in finding that Plaintiff did not meet 12.05(B).

Plaintiff has also failed to provide sufficient evidence that he *equals* a listing under the Mental Retardation Listing of 12.05(B).  A claimant's condition is medically equivalent to a condition described in one of the listed impairments if "the medical findings are at least equal in severity and duration to the listed findings." 20 C.F.R. § 404.1526(b).  This means that a claimant must present "medical findings equal in severity to all the criteria for the one most similar listed impairment." *Foster*, 279 F.3d at 355 (quoting *Sullivan v. Zebley*, 493 U.S. 521,

---

[9] Dr. Williams notes that Plaintiff began special education in fifth grade (R. 237).

531, (1990). The Regulations further explain that "[m]edical equivalence must be based on medical findings" and that "[a]ny medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1526(a). In *Daniels v. Commissioner of Social Security*, 70 Fed. Appx. 868, 874 (2003), the Sixth Circuit found that plaintiff did not *equal* the listing for mental retardation because "plaintiff presented no medical findings showing 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' prior to the age of 22." Moreover, Plaintiff was in the Army National Guard for a few weeks before they "put [him] out," and it would be assumed he was required to pass some entry examinations that would have at least to some degree accessed his mental ability.[10]

> Regarding a finding of equivalence for mental retardation, *Foster* noted:
>
> > Although the presence of multiple impairments can on occasion support a finding that the impairments are equivalent to a listing, a finding of equivalence under Listing 12.05(C) will " 'very rarely be required.' " *Riley v. Apfel*, No. 97-1799, 1998 WL 553151, at *5 (6th Cir. Aug.20, 1998) (unpublished table decision) (quoting Social Security Programs Operations Manual DI24515.056DIC).

*Foster v. Halter,* 279 F.3d at 355.

> Because Plaintiff in the present case has failed to provide any evidence of significantly subaverage general intellectual functioning with deficits in adaptive functioning' prior to the age of 22, he has failed to meet his burden of proof at step three, i.e. he has failed to demonstrate that his impairment meets or medically equals a listed impairment. Accordingly, substantial

---

[10] He reported to Dr. Williams that he was "in the military for 'one month in the 1977, at Fort Sill, Oklahoma. It wasn't for me' " (R. 238). He reported to Drs. Olsen and Date that he joined the Army National Guard for one month in 1977 "but was quickly discharged because he was unable to perform his duties" (R. 129).

evidence supports the ALJ's conclusion that Plaintiff's impairments do not equal Listing 12.05(B).

## 2.   *Mental Residual Functional Capacity*

As an alternative to a listing-level impairment, Plaintiff argues (1.) the evidence in the record demonstrates he lacks the mental residual functional capacity to work any job on a regular and continuous basis and (2.) Plaintiff cannot perform the jobs listed by the VE since he cannot meet the reading requirements as specified under the Dictionary of Occupational Titles ("DOT").[11] On intelligence testing, Plaintiff obtained a verbal IQ of 61, a performance IQ of 60, and a full scale IQ of 57.  Plaintiff's vocabulary, which is the ability to conceptualize and define words, was given a scale score of two and a percentile rank of .4%.

---

[11]  Plaintiff argues that the VE found a number of jobs, consistent with the DOT, that Plaintiff could do given the ALJ's "faulty" hypothetical which omitted the fact that Plaintiff is functionally illiterate.  Plaintiff stated he cannot read a simple note (R. 264), his wife reads his mail (R. 273), and he is unable to look up a telephone number in a phone book (R. 271).

The DOT requires an ability to read 95 -120 words per minute and to understand the meaning of 2,500 two and three syllable words in order to qualify for a Level 1 SVP. *See*, Dictionary of Occupational Titles, app. c, at 3 (4th Ed. 1991):

> *Level 1 reading - recognize meaning of 2500 (2 or 3 - syllable) words. Read at the rate of 95-120 words per minute. Compare the similarities and differences between words and between series of numbers.*

Although there was a conflict between the VE's opinion and the information provided in the DOT, the ALJ did not resolve this conflict as required.  SSR 00-4p requires that occupational evidence provided by the VE generally should be consistent with the information supplied by the DOT. When there is an apparent unresolved conflict between the VE's evidence and the DOT, the adjudicator *must* illicit a reasonable explanation for the conflict before relying on the VE's evidence to support a determination about whether the Claimant is disabled. *See, Young v Commissioner*, 351 F.Supp. 2d 644, 652 (E.D. Mich 2004).

Plaintiff concedes that "a violation of the Commissioner's requirements under SSR 00-4p is normally a remand issue" for further proceedings and not a remand for benefits (Dkt. #8, p. 10).  Therefore, the ALJ should address this conflict on remand.

Dr. Williams also found that Plaintiff was "markedly" limited in the following areas: (1) the ability to understand remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to perform activities within a scheduled, maintain regular attendance and be punctual within customary tolerances; (5) the ability to sustain an ordinary routine without supervision; (6) the ability to work in coordination with a proximity to others without being distracted by them; (7) the ability to complete a normal workday and work week without interruptions from psychologically based symptoms; (8) to perform at a consistent pace without an unreasonable number and length of rest periods; (9) the ability to accept instructions and respond appropriately to criticism from supervisors; and (10) the ability to set realistic goals and make plans independently of others (R. 245-246).  If unrebutted, numbers 4, 5, 6, 7, and 8 in particular provide strong evidence for a case of disability.

On September 29, 2002, Drs. Olson and Date also opined that Plaintiff had a global assessment of functioning (GAF) of 45, which indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." On March 9, 2004, Dr. Williams rated Plaintiff with a GAF of 60, which signals the existence of moderate difficulty in social or occupational functioning.

A 57 full scale IQ combined with the marked limitations found by Dr. Williams, and the severe medical and emotional problems described above provides substantial evidence, if unrebutted, that Plaintiff lacks the mental residual functional capacity to work any job on a regular and continuous basis.  These factors were not fully considered by the ALJ and were not included in his hypothetical to the vocational expert.  Rather, ALJ Christensen determined that

17

drug and alcohol abuse was material to a finding of disability and opined, without adequate explanation or support, that "the 'marked limitations' found by Dr. Williams and low IQ scores he noted are more consistent with alcohol and drug abuse, not with severe intellectual functioning." No such finding was made by Dr. Williams. Dr. Williams indicated Plaintiff put forth a "maximum level of effort" although (R. 239) the material question is whether that maximum effort and the test results were limited by the use of alcohol or drug abuse and the result would improve if Plaintiff ceased use of alcohol and/or drugs.

### 3.      *The Materiality of Drug and Alcohol Abuse*

In 1996, Congress passed the Contract with America Advancement Act of 1996 which amended portions of the Social Security Act which defined disability for purpose of Title II and Title XVI benefits. Pub.L. 104-121 §§ 105(a)(1), 105(b)(1), 110 Stat. 847, 852-53 (1996) (codified at 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J) (West Supp.2000)). Section 105 of that legislation, entitled "Denial of Disability Benefits to Drug Addicts and Alcoholics," states that "[a]n individual shall not be considered to be disabled for the purposes of this Title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

Regulations promulgated pursuant to this amendatory legislation prescribe a *sine qua non*, or "but for," test for determining whether alcoholism or drug addiction is a "contributing factor material" to a claimant's disability. If the claimant would still be disabled after he or she stopped using drugs or alcohol, then drug or alcohol abuse is not a contributing factor material to the disability. If, however, the claimant's limitation is not disabling absent the abuse of alcohol or drugs, then the drug or alcohol abuse is a material contributing factor which precludes a

18

finding of disability for the purpose of determining entitlement to benefits. See 20 C.F.R. §§ 416.935(b)(2)(i) & (ii).

ALJ Christensen in his December 2004 decision determined that alcohol abuse continues to be material to a finding of disability. Yet, the current record fails to support his finding that "but for" alcohol and drug abuse Plaintiff would not be disabled.  The ALJ gave six reasons for finding that drug and alcohol abuse was material to a finding of disability: (1) a prior hearing of February 24, 2000, by ALJ John Ransom found that drug and alcohol abuse was material to a finding of disability; (2) the ALJ's statement that Plaintiff had never held down a job for any significant period of time and had a long criminal history; (3) June 2003 records from St. Mary's Hospital indicate that Plaintiff is drinking a six-pack of beer a day; (4) as of September 29, 2002, Plaintiff admitted he liked hanging around people if they have something to drink; (5) The "marked limitations" found by Dr. Williams and the low IQ scores "are more consistent with alcohol and drug abuse and not with severe intellectual functioning.  Dr. Williams did not diagnosis any intelligence related impairments, " (6) Plaintiff's presentation at the time of the hearing was not consistent with a person with severe mental retardation (R. 31).[12]

Reasons (1) is not supported by evidence in the record before the Court.  The record fails to contain ALJ's Ransom's opinion.  Nor did Judge Christensen give Judge Ransom's decision administrative *res judicata* effect that might provide some presumption of a continued causal connection between Plaintiff's alcohol/drug usage and his unemployability.  Therefore, without the prior decision or record supporting it, this Court is unable to consider whether substantial

---

[12] ALJ Christensen earlier noted that Plaintiff, who started AA in February 2004, acknowledged drinking the weekend prior to the hearing. (R. 29 referring to R. 265).

19

evidence supports the ALJ's decision as to this relation of alcohol/drugs to Plaintiff's capacity to work.

Reason (2) also fails to provide substantial evidence that Plaintiff continues to abuse drugs and alcohol. The fact that Plaintiff has had trouble holding down a job and has a long criminal history could be attributed to a number of factors totally unrelated to drug and alcohol abuse.

Reason (3) and Reason (4 ) relating to 2002 and 2003 records of alcohol use do not supply substantial evidence that Plaintiff *continues* to abuse drugs or alcohol or that he would be able to work if he ceased using drugs and alcohol.[13] The Plaintiff had valve replacement surgery August 18, 2003. The record shows that Plaintiff was evaluated by two consultants prior to that operation and they reported that Plaintiff used alcohol only "occasionally" (R.197, 200). Plaintiff's liver enzymes and triglycerides are also within normal limits (*see*, Dr. Kamaraju's consultation, page 2 showing his ALT was 32, AST was 44 and triglycerides were 48, R. 208). In addition, Plaintiff testified that he had not used drugs for 4 years prior to the hearing and the state agency psychologists reported that his cocaine and heroin dependence was in remission, albeit this also was by history given by Plaintiff (R. 133). Plaintiff stated he began AA in February 2004 (R. 265), also supplied the record with a list of the dates and times of attendance at AA meetings (R. 114).

Reason (5) is an opinion that the cause of Plaintiff's low IQ test and "marked limitations"

---

[13] The ALJ indicates that on June 25, 2003, the records from St. Mary's indicate the Claimant "admitted to drinking a 6-pack of beer a day." In actuality what the record contains is statement in the social history of Plaintiff's medical records that states: "the patient is a smoker of one pack per day. Also, drinks a 6-pack of beer" (R. 167).

in various functional areas was "more consistent with alcohol and drug abuse and not with

severe intellectual functioning."  He noted "Dr. Williams did not diagnosis any intelligence

related impairments," although Dr. Williams did measure Plaintiff's Full Scale IQ at 57 and did

diagnose "This patient's cognitive skills fall in the Intellectually Deficient range of function."

Many would consider such finding to be an "intelligence related impairment"(R. 241).  Neither

Dr. Williams  – nor any one else other than ALJ Christensen –  made  any statement indicating

that Plaintiff's IQ test scores or his "markedly limited" functions in several areas were  " more

consistent with alcohol and drug abuse and not with severe intellectual functioning."  Dr.

Williams did recommend continued individual and group counseling for Plaintiff's "emotional

issues" but made no mention of AA or other alcohol related treatment nor did he indicate any

question that Plaintiff's drinking affected his IQ test results.  Thus, this determination by ALJ

Christensen that the "marked limitations" found by Dr. Williams and the low IQ scores "are

more consistent with alcohol and drug abuse and not with severe intellectual functioning"

appears to be  pure speculation and is not supported by medical findings or other evidence in he

record.  The ALJ is not a medical doctor, psychiatrist or psychologist and is therefore not

qualified to determine whether someone's functional limitations and IQ scores are the product of

alcohol or drug usage without some competent evidence or more thorough explanation for the

conclusion than provided here.[14]

_____

[14]  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (noting that an ALJ may not
"substitute his own judgment for a physician's opinion without relying on other medical evidence
or authority in the record".)  *Morse v. Shalala*, 16 F.3d 865, 873 (8th Cir. 1994):

> In contrast to [a treating physician], the ALJ is not a medical expert and cannot by
> his legal expertise discount and reject the medical findings and conclusions of the
> physician.  His role is not to make a personal estimate of the claimant's impairments

Similarly, ALJ Christensen's reason (6) – that Plaintiff's presentation at the time of the hearing was not consistent with a person with severe mental retardation – while not totally irrelevant because lay opinion is generally permitted on issues of mental status, this opinion is conclusory, unexplained and insufficient.[15]

Here the record contains medical evidence on Plaintiff's intellectual limitations which while not sufficient to legally compel a finding of disability under the Listings at Step 3 of the Commissioner's sequential evaluation, are nonetheless significant to a determination at Step 5. In addition to the intelligence tests results of a full scale IQ of only 57 and the other "marked limitations" found by Dr. Williams, Dr. Olson and Dr. Date indicated that Plaintiff appeared to have struggled with a "Learning Disability and probable Borderline Intellectual Functioning

---

but to base his findings on whether the credible evidence before him sustains or does not sustain the claimant's asserted disability.

An ALJ's own judgment cannot substitute for an uncontroverted medical opinion. *Rosado v. Secretary of HHS*, 807 F.2d 292, 293-94 (1st Cir. 1986). In another psychiatric impairment case, it was found to be an abuse of discretion for the ALJ to evaluate plaintiff's residual functional capacity without making any effort to obtain the assistance of a mental health professional. *Andrade v. Secretary of HHS*, 985 F.2d 1045, 1049 (10th Cir. 1993). Here there is no opinion from a mental health professional suggesting Plaintiff's IQ scores or functional limitations were related to drug or alcohol abuse and not to limited intelligence.

[15] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (noting that an ALJ may not "substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record".); *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) ("An ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record.") *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) ("Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record."); *Belden v. Heckler*, 586 F.Supp. 628, 634-635 (N.D. Ind. 1984) ("It is correct that an ALJ has the obligation to observe the plaintiff to make the necessary credibility determinations. However, the ALJ may not substitute lay observations for expert medical evidence.").

since early childhood."

In *Branham v Heckler*, 775 F. 2d 1271, 1274 (4th Cir. 1985), the Court of Appeals declared that in the absence of contrary evidence explaining a change of intellectual capacity, mental retardation as determined in that case by IQ test results was a "lifelong condition," and reversed the decision of the district court and remanded for an award of benefits.

> There is no evidence in this record that the condition in Plaintiff was transient, had a recent onset or was influenced by ingestion of alcohol or drugs....The Court concludes that the factual record in this case is complete and there is no new evidence to be presented....The Court finds that there is no evidence in this record that Plaintiff's slow intellectual functioning is caused or exacerbated by drug or alcohol abuse. In other words, if Plaintiff were to stop drinking and using drugs, he would still suffer from low intellectual functioning. Alcohol and drug abuse, therefore are not contributing factors material to Plaintiff's disability."

In the present case, the ALJ's decision lacks substantial support for his finding that drugs and alcohol abuse continue to be material to Plaintiff's disability.  While Plaintiff's impairment may fail to meet or medically equal a listing due to a lack of information prior to age 22,[16] his IQ

---

[16] Other Circuits have allowed IQ tests taken after the required onset date prior to age 22 to be used to establish disability under the listing in the absence of evidence indicating some factor that might have negatively affected the IQ test.  "[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Maresh v. Barnhart,* 431 F.3d 1073, 1075 (8th Cir., 2005), quoting  *Muncy v. Apfel,* 247 F.3d 728, 734 (8th Cir. 2001); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); *Luckey v. Department of Health & Human Servs.,* 890 F.2d 666, 668-69 (4th Cir. 1989) (ALJ may assume claimant's IQ remained relatively constant  in absence of evidence showing a change in claimant's intelligence functioning); *Sird v. Chater,* 105 F.3d 401, 402 n.4 (8th Cir. 1997); 65 Fed. Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on *current evidence,* to infer when the impairment began.") (emphasis added ) .

The Sixth Circuit's *Foster* case does not preclude such a finding in this circuit because in that case Foster's first IQ test was taken at age 42, and its results were questioned by the examiner due to lack of effort.  Her only qualifying test was thereafter done by a consultant to whom her attorney directed her.  She also did not have sufficient alternate evidence, as in the present case, that would suggest the post age 22 IQ testing was consistent with her childhood intelligence.  Foster attempted unsuccessfully to take the GED four times after nine years of

score and the marked limitations noted by Dr. Williams support a finding, if unrebutted, that Plaintiff lacks the mental residual functional capacity to work any job on a regular and continuous basis.

ALJ Christensen fails to rebut this contention with substantial evidence. Rather, ALJ Christensen opined, without adequate explanation or support, that "the 'marked limitations' found by Dr. Williams and low IQ scores he noted are more consistent with alcohol and drug abuse, not with severe intellectual functioning." [17] This causal relationship is one that ordinarily requires some expertise to make. On the present record, there is no evidence that Plaintiff's continued use of alcohol or drugs affected Plaintiff's test results or otherwise caused plaintiff's low performance.

Furthermore, even if there were such evidence, if Plaintiff's drug or alcohol use caused disabling mental limitations not reversed by ceasing the use of alcohol or drugs, Plaintiff can be found disabled even under the 1996 amendments.

In order to determine whether a claimant's alcohol or drug use precludes them from receiving Social Security benefits the ALJ must first determine whether a claimant is disabled and then determine whether alcohol or drug use is a material contributor to the determination of disability, i.e. what or whether limitations would remain in the absence of alcoholism or drug

---

special education. While this evidence may have been submitted to suggest she had an IQ below 70 prior to turning 22, others might not interpret a person who attempted to take a high school graduate equivalency test four times as mentally retarded and disabled. Similarly, in the present case the evidence is not such that an ALJ was required as a matter of law to accept an IQ test taken at age 44 where evidence shows he was not placed in special education until 5th grade and he later was able to gain entry into the Army Reserves, albeit for only a short period.

[17] Dr. Williams does not state that his findings are more consistent with alcohol and drug abuse.

addiction.[18]

_____

[18]  Upon a finding that a claimant's impairments are sufficiently severe to be disabling, the Commissioner's Regulations dictate that the ALJ next determine how the claimant's limitations are affected by their substance use, i.e. whether they would still be considered disabled without the substance use.

20 C.F.R. §440.1535 and § 416.935:

**How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.**

a) *General.* If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness.

(b) *Process we will follow when we have medical evidence of your drug addiction or alcoholism.*

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

"If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. *See Social Security Administration Emergency Teletype*, No. EM-96-94 at Answer 29 (Aug. 30, 1996), *quoted in Fastner v. Barnhart*, 324 F.3d 981, 986 (8th Cir.2003); *Dru Stevenson, Should Addicts Get Welfare?: Addiction & SSI/SSDI*, 68 Brook. L.Rev. 185, 194 & nn. 47-49 (2002).  In colloquial terms, on the issue of the materiality of alcoholism, a tie goes to [the claimant]." *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th

25

The ALJ must first reach the determination regarding the claimant's disability using the standard five-step approach described in 20 C.F.R. §404.1520 without segregating out any effects that might be due to substance use disorders. *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001); *Doughty v. Apfel*, 245 F.3d 1274 (11th Cir. 2001).[19]

It does not appear that ALJ Christensen's decision followed this sequence and his determination that "the 'marked limitations' found by Dr. Williams and low IQ scores he noted are more consistent with alcohol and drug abuse, not with severe intellectual functioning" is not only not supported by adequate evidence, it is premature to an initial finding on the question of whether plaintiff would be disabled on the evidence "without deductions for the assumed effects of substance use disorders."[20] For these reasons, the ALJ's decision is not supported by substantial evidence and must be reversed.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that after finding reversible error it is appropriate for the undersigned to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  This

_____

Cir. 2003).

[19]   As noted in *Brueggemann,* 348 F.3d at 694:

The determination has to be based on substantial evidence of the claimant's medical limitations "without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established.  Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability.  *See* 20 C.F.R. §404.1527. *Id* "

[20] *Brueggemann,* 348 F.3d at 694.

entitlement is established if "the decision is clearly erroneous, proof of disability is

overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher*

citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff argues that a remand for benefits is warranted in light of *Davis v Commissioner*,

133 F. Supp 2d. 542 (E.D. Mich 2001).  In *Davis*, Judge Lawson found:

> The administrative record contains an extensive work up by Dr. Gerald R. Williams,
> a psychologist, which indicates the results of an IQ test administered on January 25,
> 1998 showing verbal - 61, performance - 60 and full scale - 56... There is no
> suggestion in the report that alcoholism or drug abuse affected the test results or
> otherwise caused Plaintiff's low intellectual functioning. Although this information
> was before the ALJ, he did not comment on why the January 25, 1998 test results
> were disregarded or why they did not establish a listing-level impairment. The Court
> does not view these results as conflicting with the results of the test administered by
> Dr. Cappone. Dr. Cappone declared her test results invalid; however, those tests did
> not establish an IQ above 59. The only evidence in the administrative record is that
> Plaintiff's full scale IQ is below 59."

*Davis*, 133 F. Supp 2d. at 5467.

The present case, however, is distinguishable.  In *Davis*, the court determined that absent

drug and alcohol abuse plaintiff met the listing.  Yet, *Davis* involved a claimant who had been

found disabled prior to the 1996 amendments to the Social Security Act, and was then terminated

based on those amendments.  He reapplied for benefits and was again denied benefits, and

sought review in this Court.  Yet, based on yet another application filed the day after the ALJ's

decision denying benefits that was being reviewed, Plaintiff was again awarded disability

benefits for meeting Listing 12.05(B) (This finding would establish her having an IQ qualifying

for benefits  under 12.05(B) prior to her 22 birthday, although she was in her 40's during this

application period.).  Thus the issue before this court was a dispute over disability for a closed

period of October 16, 1996, through June 25, 1998.  *Davis*, 133 F. Supp 2d. at 546.  Clinical

psychologist Gerard R. Williams specifically noted that plaintiff had not consumed alcohol within 24 hours of the testing and he stated his opinion that the test results were "an accurate portrayal of this patients' [sic] current level of cognitive functioning." *Id.* at 547. The same Dr. Williams did not make similar findings in the present case.

Here, regardless of drug and alcohol abuse, the Commissioner has not found Plaintiff met the significant "subaverage general intellectual functioning before age 22" as required by Listing 12.05. Nor is the present record such that this Court can require such a finding as a matter of law for reasons noted above.

In *Davis*, the findings of Dr. Williams were stronger on confidence in the test results and the lack of alcohol for 24 hours prior to the test. In *Davis*, Judge Lawson determined that there was no evidence in the record that the condition in plaintiff was transient, had a recent onset, or was influenced by ingestion of alcohol or drugs. In the present case, there is some evidence that alcohol or drugs has affected Plaintiff's condition in the past, thereby causing a possible transient influence. Unlike Dr. Williams, Drs. Olson and Dr. Date opined that Plaintiff's prognosis for improved psychosocial functioning was contingent upon whether or not he entered into appropriate substance abuse treatment and case management (R. 134).

In this case "all essential factual issues" have been *not* been resolved with regard to the impact of Plaintiff's alcohol abuse on his level of functioning. The ALJ has failed to make the specific findings required by 20 C.F.R. § 416.935 after making the 20 C.F.R. §404.1520 findings without factoring in the alcohol and drug factor. The ALJ has failed to provide substantial evidence justifying his treatment of Dr. Williams' findings through the use of medical evidence or a proper hypothetical. Moreover, he has failed to resolve a conflict between the VE's

testimony and the DOT regarding Plaintiff's reading abilities and there effect on competitive employment.  Nor is the current case one where "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking" as could surely be said in *Davis*.  Accordingly, a remand for further administrative proceedings consistent with this Report and Recommendation is necessary.

## III.   RECOMMENDATION

For the following reasons, **IT IS RECOMMENDED** that this case be **REMANDED** for further administrative proceedings consistent with this Report and Recommendation.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 29, 2007                          s/Steven D. Pepe                          
Ann Arbor, Michigan                            United States Magistrate Judge


### CERTIFICATE OF SERVICE

I hereby certify that on <u>March 29, 2007,</u> I electronically filed the foregoing paper with the Clerk  Court using the ECF system which will send electronic notification to the following: <u>James A. Brunson, AUSA, Lewis M. Seward, Esq..,</u>  and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

<u>s/ James P. Peltier</u>
James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
 pete_peliter@mied.uscourts.gov

30